**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

REBECCA PARSONS,

                Plaintiff,

        v.

HELLAS CONDOMINIUMS,
PETER GREENO, and
EDMARA ALLRAN,

                Defendants.

No. _____

**COMPLAINT**

Jury Trial Demanded

**INTRODUCTION**

1.      Plaintiff Rebecca Parsons brings this civil rights lawsuit against Defendants Hellas Condominiums ("Hellas"), Peter Greeno, and Edmara Allran (collectively, "Defendants"), for discrimination on the basis of disability and retaliation in violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551–4634.

2.      Ms. Parsons, a graduate student, has multiple disabilities that cause her chronic pain and fatigue, significantly impede her balance and mobility, and cause panic attacks and other post-traumatic stress disorder ("PTSD") symptoms. For most of her life, Ms. Parsons has depended on family members, aides, or specially trained service animals to assist her in performing daily tasks because of her disabilities.

3.      In January 2024, Ms. Parsons purchased a residential dwelling unit (the "Unit") at Hellas, a condominium community in Old Town, Maine, located close to the university where she is a student. Hellas is governed by a unit owners' association (the "Association") led by an elected board of directors (the "Board"). She moved into the Unit with her service dog, Otis. Otis was

specifically trained to provide Ms. Parsons with assistance with her disabilities, including by acting as a counterbalance and providing forward momentum while she is walking, and by performing deep pressure therapy and comforting her when experiencing panic attacks and other PTSD symptoms.

4.    Because of her disabilities, Ms. Parsons made two reasonable accommodation requests to the Association related to her service animal. First, she requested that she be permitted to construct a small, temporary, turkey wire fence off of her porch in the common yard to allow Otis to safely relieve himself without requiring Ms. Parsons to physically accompany him outside, which was difficult and dangerous for Ms. Parsons because of her disabilities. Second, when her husband later moved in with his pet dog, she requested that Hellas formally recognize Otis as a service animal, not a pet, as an accommodation from the Association's "one pet per unit" policy.

5.    Despite this, throughout 2024, Defendants violated Ms. Parsons's established civil rights under federal and state fair housing laws by denying her requests for reasonable accommodations and retaliating against her for seeking those accommodations and asserting her fair housing rights. Defendants Greeno and Allran, both of whom are Hellas residents and served on the Board at relevant times, engaged in a campaign of intimidation against Ms. Parsons. Defendant Greeno, while serving as Board president, asked neighbors to surveil Ms. Parsons and report her activities back to Defendants; made false reports about her to the police; and threatened to forcibly remove her service dog from her home. Both Greeno and Defendant Allran repeatedly and publicly disparaged Ms. Parsons for having disabilities and needing accommodations to the Board and other Hellas residents, and caused her to suffer extreme fear, anxiety, and emotional distress. Ultimately, Ms. Parsons was forced to obtain temporary orders of protection from harassment from the Bangor District Court against both Greeno and Allran, forbidding them from

threatening, harassing, or following Ms. Parsons, entering her home, or taking her property. To this day, Defendant Greeno continues, on a public website, to threaten frivolous civil and criminal charges against Ms. Parsons for criticizing his handling of her reasonable accommodation requests.

6.     Ultimately, over nine months after Ms. Parsons requested the fence as an accommodation, the Board "approved" the request with burdensome, unnecessary conditions that had the intent and effect of making it difficult for Ms. Parsons to build the fence. Even after Ms. Parsons provided unnecessary and invasive medical documentation the Board requested— including reluctantly giving the Board's attorney permission to discuss her medical history with her physician—Defendants Greeno and Allran still refused to approve her existing turkey wire fence. Greeno "abstained" from voting, and Allran voted to deny it; the request was only granted by a majority vote of the other Board members. But even after that approval, Defendant Greeno, as the Board president, continued to demand onerous, costly, and impossible-to-satisfy conditions to the Board's approval, including a requirement that Ms. Parsons's fenced-in area be surveilled by the Board, with the purpose and effect of ultimately denying Ms. Parsons the ability to reside safely in her home.

7.     Due to Defendants' continuing hostility and refusal to accommodate Ms. Parsons's disabilities, Ms. Parsons and her husband were forced to move out of their Unit in December 2024 and find alternative housing.

8.     As a result of Defendants' actions, Ms. Parsons has suffered significant emotional distress, economic losses, and the loss of housing opportunities.

9.     Ms. Parsons now brings this action alleging violations of her fair housing rights and retaliation for engaging in protected activity under the FHA and MHRA. She seeks compensatory

damages for her actual and nonmonetary injuries, punitive damages, appropriate injunctive relief, and her reasonable attorneys' fees and costs.

## PARTIES

10.     Plaintiff Rebecca Parsons is an adult resident of Milford, Penobscot County, Maine. She is a graduate student studying social work at the University of Maine in Orono. Since January 2024, Ms. Parsons has owned Unit #15 at Hellas Condominiums in Old Town, Penobscot County, Maine, where she resided until December 2024.

11.     Defendant Hellas Condominiums is a twelve-unit residential condominium housing community located in Old Town, Penobscot County, Maine. It is a self-governed condominium where all unit owners are members of the unit owners' association, which is governed by an elected five-person Board of Directors.

12.     Defendant Peter Greeno is an adult resident of Old Town, Penobscot County, Maine. At all relevant times, Defendant Greeno has owned and resided in a condominium unit at Hellas. Defendant Greeno is a member of the Association and served as President of the Board from June 2021 to early 2023, and again from July 2024 to present.

13.     Defendant Edmara Allran is an adult resident of Old Town, Penobscot County, Maine, and resided in a condominium unit at Hellas at all times relevant to this Complaint. Defendant Allran was a member of the Board from January 2023 to February 2026.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 3613.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

16.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(1) because all Parties reside in the District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

### Ms. Parsons is a Person with Disabilities

17.     Ms. Parsons has multiple physical disabilities that cause chronic pain and fatigue and substantially impede her balance and mobility.

18.     Ms. Parsons has been diagnosed with Postural Orthostatic Tachycardia Syndrome ("POTS"), a nervous system disorder characterized by excessive, and rapid heart rate increase upon standing. Ms. Parsons's POTS symptoms include dizziness, lightheadedness, low blood pressure, tachycardia, and shortness of breath.

19.     Ms. Parsons has also been diagnosed with Hypermobile Ehlers-Danlos Syndrome ("hEDS"), a rare, hereditary connective tissue disorder that causes Ms. Parsons to suffer from hypermobile joints and chronic, often debilitating pain. Ms. Parsons's joint hypermobility makes her especially vulnerable to joint dislocations and subluxations (incomplete or partial dislocations that cause pain, swelling, and instability).

20.     As a result of these physical disabilities, Ms. Parsons struggles to ascend and descend stairs, traverse uneven surfaces unassisted, and perform routine daily activities that rapidly bring on fatigue or shortness of breath. For Ms. Parsons, simply leaving her home can be an ordeal. Accordingly, she has relied on family members, caregivers, aides, and service animals for most of her life.

21.     In 2018, Ms. Parsons was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), which causes her to experience panic attacks, anxiety, dissociation, nightmares, intrusive memories, and avoidance symptoms and behaviors.

22.     At all relevant times, Ms. Parsons owned a service dog, Otis, a 55-pound Standard Poodle specifically trained to assist Ms. Parsons in managing her physical and mental health disabilities. Otis wore a specialized harness and a vest while working, which provided Ms. Parsons with additional balance and support while walking and communicated to onlookers that he was a working service animal, not a pet. Otis was also trained to perform deep pressure therapy, which activates the parasympathetic nervous system and reduces anxiety or panic symptoms, and service-dog comfort therapy, which includes task-based assistance to Ms. Parsons while experiencing panic attacks and other PTSD symptoms.

### Ms. Parsons Purchased the Unit in January 2024

23.     Hellas has twelve townhouse-style units in two six-unit buildings, which are separated by a paved parking lot. A common grassy area sits behind each of the two buildings. The front door to each unit faces the parking lot, and the back door to each unit faces one of the grassy areas. *See* Figure 1.



*Figure 1 – Aerial view of Hellas Condominiums*

24.    In December 2023, Ms. Parsons, expressed interest in Unit #15 at Hellas and made an offer to purchase it.

25.    Prior to the closing on her purchase of the Unit, Ms. Parsons and her mother, Laura Nicolino, corresponded with Lisa Applegate, the Hellas Board President at the time, about Ms. Parsons's disabilities and her need for a live-in aide as a reasonable accommodation to Hellas's leasing restrictions on non-family members. Laura Nicolino explained to Ms. Applegate that her daughter has physical disabilities and has relied on aides for "her whole life." Ms. Applegate initially approved the accommodation request on December 29, 2023, and confirmed that no additional documentation was needed to support the requested accommodation. The next day, December 30, 2023, Ms. Applegate revoked her approval without explanation and stated that she needed to speak to the Board's attorney about the accommodation request.

26.    Ms. Applegate relayed the live-in aide request to the Board. Over the following week, in January 2024, Board members exchanged emails characterizing the Ms. Parsons's reasonable accommodation request as "fishy," "weird," "strange," and "backwards," all without ever meeting her or asking her to submit documentation in support of the request.

27.    On January 10, 2024, Ms. Applegate informed Ms. Parsons that the Board needed a letter from a "licensed professional" stating that she required a live-in aide as a medical accommodation for her disability. Ms. Parsons responded that she would provide that documentation after she moved in, and noted that it might ultimately become unnecessary if a family member moved in with her.

28.    Ms. Parsons finalized her purchase of the Unit in late January 2024. On or around February 9, 2024, she moved in, by herself, with Otis.

29.     Each unit at Hellas, including the Unit, has a small back porch with a short staircase leading to one of two common grassy areas in the complex. *See* Figure 2.



*Figure 2 – Back porches leading to shared grassy space*

**The Board Denies Ms. Parsons's Fence Accommodation Request**

30.     The Association's bylaws require unit owners to keep dogs leashed while outside on the Hellas property. Hellas is adjacent to a busy road, making it unsafe to allow animals to roam freely off leash.

31.     Ms. Parsons understood the rule but realized that she needed an accommodation to allow Otis to relieve himself unaccompanied. Walking Otis required Ms. Parsons to use a small staircase and walk outside, sometimes in slippery conditions, each time he needed to relieve himself. This exacerbated Ms. Parsons's disability-related pain and proved an impossible task on days when her POTS and hEDS symptoms prevented her from walking more than a few steps without pain and difficulty. In addition, the grassy area outside the Unit was uneven and poorly maintained, which made it dangerous for Ms. Parsons to walk on it unassisted. She typically traversed this area with Otis and his specialized harness; however, the harness indicated to Otis that he was "working," and he was trained not to relieve himself while in "work mode." Thus,

8

when Otis needed to relieve himself, Ms. Parsons was forced to walk him on a regular, non-supportive leash, which exposed her to a heightened risk of injury.

32.     Ms. Parsons began testing solutions that would allow Otis to relieve himself independently without increasing the risk that she might fall or suffer an injury.

33.     Initially, Ms. Parsons enlisted family and friends to take Otis outside when her disabilities prevented her from doing so. She tested out extra-long leashes that clipped to her porch that were supposed to allow Otis to go outside unaccompanied. She and her mother also laid artificial turf on the porch and placed bales of hay on the steps to allow Otis to urinate on the porch without being leashed; however, Ms. Parsons still had to walk Otis outside on a regular leash, without his supportive harness, for him to defecate.

34.     None of these alternative arrangements addressed the underlying, disability-related limitations that prevented Ms. Parsons from regularly walking Otis outside. As a result, Ms. Parsons accompanied Otis outside even when doing so meant risking pain, injury, and fatigue, often making it impossible for her to perform other necessary daily functions, such as making herself food.

35.     The Association's bylaws forbid unit owners from erecting fences in the common grassy area outside their units. To ease the physical burden of walking Otis on a leash every time he needed to relieve himself, and to reduce the chance that she might fall or be injured as a result, Ms. Parsons requested a reasonable accommodation from the Association's no-fence policy. She sought permission to erect a small fenced-in area immediately outside her back porch, enclosed with turkey wire fencing, where Otis could relieve himself off-leash without requiring Ms. Parsons to accompany him outside.

9

36.     Other homeowners utilized common property for private purposes without issue. For example, the owners of Unit 18 stored a large generator that only serviced their unit on the grass adjacent to their porch. Also, Defendant Greeno had erected an enclosed vegetable garden in the common grassy area using turkey wire fencing, charging other Unit owners to use the garden. *See* Figure 3. Upon information and belief, neither Greeno nor the owners of Unit 18 required or had reasonable accommodations to use common property in this manner.



*Figure 3 - Defendant Greeno's vegetable garden surrounded by turkey wire fencing*

37.     On February 13, 2024, Ms. Parsons emailed Ms. Applegate to request approval to erect a small fence directly off her back porch as an accommodation for her disabilities. She explained that the request was related to her disabilities and that she could provide a letter from her doctor attesting to the need for the accommodation.

38.     Ms. Applegate denied the request immediately and without discussion, stating by email that a fence would not be allowed "even with a medical exception." Ms. Applegate asserted that the grassy area off of Ms. Parsons's porch was common property, that "any private use of the grass is prohibited," and that the requested accommodation was "not possible or reasonable." She

stated that Ms. Parsons could submit medical documentation to the Board if she wished, but that she "[did not] see how it would be possible" for the Board to grant her request.

39.    Ms. Parsons did not submit medical documentation to the Board at that time, as she reasonably believed, based on Ms. Applegate's remarks, that doing so would be futile. Accordingly, she did not pursue the fence request further for several months. She continued to walk Otis herself on leash, exacerbating her disability symptoms and exposing her to the risk of injury.

**Ms. Parsons Requests an Accommodation for Her Service Animal**

40.    In May 2024, Ms. Parsons's then-fiancé and now-husband, Peter Parsons, moved into the Unit with his pet dog.

41.    Shortly after Mr. Parsons moved into the Unit, the Board sent Ms. Parsons a warning, claiming that she was in violation of the "one-dog-per-unit" policy and ordering her to promptly remove one of the dogs from her home.

42.    Ms. Parsons responded that Otis is a service animal specially trained to assist her in managing her disabilities, and is not a "pet" subject to the Board's pet policies. She attached a letter from her doctor confirming that she is a person with disabilities, as well as documentation indicating that Otis was specially trained to assist her with her disabilities.

43.    On May 31, 2024, Board Secretary Greta Lowe responded, thanking Ms. Parsons for sending the documents and promising to review them with the Board. She also stated that the Board needed to "swab" Otis for PooPrints, a service used by the Association to identify pet owners that do not clean up dog waste. The Association required dog owners in the community to submit a DNA sample for each dog and pay a processing fee to PooPrints. Ms. Parsons did not complete the PooPrints request because Otis, as a service animal, was not subject to the Board's pet policies.

44.    Ms. Parsons did not receive further communications from the Board about her documents and did not receive any further warnings about the "one-dog-per-unit" policy. As such, Ms. Parsons believed the issue was resolved.

**In June 2024, Ms. Parsons Makes a Second Reasonable Accommodation Request to Erect a Fenced-In Enclosure Outside Her Back Door**

45.    On or around June 20, 2024, Ms. Parsons sent a letter to the Board renewing her request for permission to erect a small fenced-in enclosure off her back porch as a reasonable accommodation. She explained, as she had in February 2024, that her disabilities make it difficult, painful, and potentially dangerous for her to regularly walk Otis outside and that the requested accommodation would provide him with a safe space to relieve himself without requiring Ms. Parsons to physically accompany him. Ms. Parsons added that the requested fence would likely be a reasonable accommodation under the federal Fair Housing Act, which allows for reasonable structural modifications to accommodate residents with disabilities like herself.

46.    On June 27, 2024, Ms. Lowe confirmed receipt of the request and stated that the Board would discuss it with its attorney.

47.    After Ms. Parsons submitted her second fence request, the Board exchanged internal emails disparaging her and her disabilities. On June 24, 2024, Defendant Allran, a Board member at the time, wrote, "Before [Ms. Parsons] bought the unit she knew the rules and fences are not allowed. She never asked the board before buying. Just bringing the problems with her." Another Board member, Matthew Pinkham, responded that the Board should not be concerned about "doing right" by Ms. Parsons; that he was "skeptical of this fencing need" because he had seen Ms. Parsons walking Otis in the past; and that "allowing someone to portion [sic] off a communal area is unacceptable."

12

48.     Ms. Applegate emailed the Association's attorney, Charles Katz-Leavy, on June 24, 2024, seeking advice about Ms. Parsons's accommodation request. In her email, Ms. Applegate wrote, "[t]he new owner of Unit 15 is listing a fenced in area of a common space as an accommodation request, however, she knowingly purchased a unit that does not include any private outdoor spaces." She incorrectly asserted to Mr. Katz-Leavy that Ms. Parsons "does not have a visible mobility issue," even though Ms. Parsons utilized a service animal and specialized equipment to walk, and she had disability placards on her car issued by the State of Maine.

49.     Mr. Katz-Leavy responded to Ms. Applegate on June 27, 2024. He stated that the fence request was "likely a reasonable accommodation," that granting it would be the "least amount of risk for Hellas," and that "[f]ailure to comply" with federal and state fair housing laws "can result in penalties and significant legal fees." He noted that, if Ms. Parsons's disability was "not apparent," the Board could ask her to provide medical documentation demonstrating her need for the fence and the service animal. Mr. Katz-Leavy did not state or imply that the receipt of Ms. Parsons's medical documentation was a necessary condition for the Board to grant her accommodation requests. To the contrary, Mr. Katz-Leavy advised that the requested accommodation was likely reasonable and that failing to comply with applicable fair housing laws would expose the Board to legal and financial risk.

50.     On July 13, 2024, Ms. Lowe informed Ms. Parsons that because her disability was "not apparent," the Board "need[ed] documentation" from a healthcare professional attesting to her need for the requested accommodations. Ms. Parsons responded that her disability is obvious, that she uses a service animal to walk, that she has disability placards on her car issued by the State of Maine, and that she had already provided medical documentation to the Board stating that she has a disability. Nonetheless, Ms. Lowe responded that the Board could not determine if Ms.

Parsons had a disability and reiterated that the Board "need[ed]" a letter from a healthcare professional before it would grant her request.

51.    Ms. Parsons asked that Ms. Lowe support her contention that the Board "need[ed]" additional medical documentation as a condition for approving her requested accommodation. Ms. Lowe did not respond, and, without that information or an explanation of why further medical documentation was necessary, Ms. Parsons provided no additional documentation at that time.

**Ms. Parsons and Defendant Greeno Discuss Her Request for Accommodations**

52.    In July 2024, Ms. Applegate resigned as President of the Board. Defendant Greeno assumed the role of Board President, which he has held consistently through the present date.

53.    On July 15, 2024, Defendant Greeno met with Ms. Parsons and her husband in their Unit and discussed Ms. Parsons's requests to erect a fence as a reasonable accommodation for her disabilities. Ms. Parsons referenced Ms. Applegate's February 2024 emails denying her first request for the fence. To Ms. Parsons's surprise, Defendant Greeno responded, "There is no reason to save them. What I'd like, what I'd prefer as a homeowner here, is that you just say, 'it's over.'" Ms. Parsons understood "no reason to save them" as referring to Ms. Applegate's emails evidencing the wrongful denial of the requested fence accommodations by the Board, and that Defendant Greeno was encouraging her to delete those emails.

54.    Defendant Greeno then asserted, with regard to Ms. Parsons's request for permission to erect her fence, that "[the Board's] hands are pretty tied, whether you like it or not." Ms. Parsons understood this to mean that the Board would not approve her requests for accommodations even with additional medical documentation.

55.    Ms. Parsons told Defendant Greeno that she did not understand why the Board would deny her request for the fence on the grounds that it involved private use of common space when Defendant Greeno himself was permitted to maintain a similar fenced-in vegetable garden

on common property using the same turkey wire fencing she intended to use for her requested fenced-in enclosure. Greeno responded that his vegetable garden was permissible because unit owners could pay to use it, but he did not explain why that distinction justified denying Ms. Parsons a reasonable accommodation request for her disability.

56. The Board discussed Ms. Parsons's accommodation request at its scheduled meeting on July 21, 2024. The minutes from the meeting—which are publicly available on the Board's website—state that "[t]he meeting adjourned to executive session at 10:45 am to discuss Unit 15 accommodation request." This effectively and inappropriately disclosed to anyone with Ms. Parsons's address that she made a disability-related accommodation request to the Board.

**Defendants Admit That They Discriminated Against Ms. Parsons, Then Constructively Deny Her Request for Accommodations by Imposing Unreasonable and Burdensome Conditions on Their Tentative "Approval" of a Fence**

57. On August 2, 2024, after being sworn in as Board President, Defendant Greeno reviewed Ms. Parsons's accommodation request for the fence and emailed the Board a report of his "findings and recommendations." In the body of the email, Defendant Greeno admitted that the Board had "already discriminated" against Ms. Parsons and was at risk of incurring "huge legal costs and severe penalties."

58. Several days later, on August 8, 2024—six months after Ms. Parsons's original request for a fence accommodation—Defendant Greeno sent Ms. Parsons a letter from the Board "tentative[ly]" approving her service animal and fence requests. The letter stated that Ms. Parsons was required to submit "prescriptive letters" from her doctors explaining why the service animal and fence were "necessary accommodation[s] for [her] disability." The letter further specified that the Board would not simply grant Ms. Parsons's requests upon receipt of those "prescriptive letters." Rather, the letter stated that the Board needed to independently "verify" the letters by contacting Ms. Parsons's physicians directly, and then "respond" to those letters.

15

59.     These invasive conditions made Ms. Parsons deeply uncomfortable, given the Board's poor record of keeping her medical information and requests for accommodations confidential from other Hellas residents. Ms. Parsons interpreted the requirement that the Board "verify" and "respond" to her doctors' letters to mean that the Board intended to interrogate her physicians about her medical history and why her requested accommodations were necessary for her disabilities, which she understood to be wholly improper under the law, unnecessary to obtain an accommodation, and a blatant violation of her privacy.

60.     The Board's August 8 letter acknowledged that "[w]hether Otis is a service/assistance dog decides . . . whether you pay HOA fees for Otis such as the DNA swab," an apparent reference to the PooPrints processing fee. Thus, Defendant Greeno and the Board understood that the Association's pet fees and DNA swab requirements do not apply to service animals.

61.     The August 8 letter further conditioned the fence's approval on several costly, aesthetic demands that were unrelated to Ms. Parsons's use of the fence as an accommodation for her disabilities. Specifically, the letter mandated that the fence—unlike Defendant Greeno's vegetable garden fence made of turkey wire—be:

> a white vinyl picket fence, 4' in height, of a thickness that will not deteriorate quickly when subjected to a weed whacker. The fence will not be attached to the building in any way. The installation must be by an insured vendor, disclosed to the HOA through a variance request prior to beginning the work.

62.     In the August 8 letter, Defendant Greeno admitted that the Board's previous responses to Ms. Parsons's requests had been "poor in several ways," but then blamed Ms. Parsons, not the Board, for the Board's delay in responding to her requests.

63.     Defendant Greeno asserted that "[t]he original denial on February 13, 2024 stemmed from a volunteer neighbor that was untrained in disability related [sic] situations and

legislation. The response was to quote our regulations, without the knowledge on how to handle a disability-related request for accommodation."

64.    The "volunteer neighbor" was, in fact, former Board President Lisa Applegate, who was acting in her official capacity as President when she denied Ms. Parsons's accommodation request for the fence in February 2024. Her messages denying the request were even sent from the official "Hellas President" email address, not Ms. Applegate's personal email address.

65.    The August 8 letter troubled Ms. Parsons for several reasons. First, she thought that the Board acknowledged in May 2024 that Otis was a trained service dog and had granted an exception to the one-dog-per-unit policy, and was surprised to learn that the Board did not share this understanding. Second, Ms. Parsons was concerned that Board members would not protect her private health information if she submitted additional medical documentation to them. Third, Ms. Parsons believed that the aesthetic demands required by the Board would be unnecessarily costly to meet and maintain, were subjecting her to arbitrary requirements not imposed on other unit owners' use of common property, and that the Board was imposing those unreasonable conditions in an attempt to constructively deny the necessary accommodation or revoke it if she were unable to meet those requirements.

66.    Notably, the aesthetic demands required of Ms. Parsons's fence did not apply to Defendant Greeno's vegetable garden, which was enclosed by turkey wire—the same material Ms. Parsons intended to use for her enclosure. *See* Figure 3, *supra*. Additionally, the requirement that the fence be installed by an "insured vendor" appeared to only apply to Ms. Parsons; previous, more substantial projects on the Property had been completed by other unit owners themselves, not by insured vendors, including Mr. Greeno's construction of the vegetable garden. Even the

17

long fence that runs along the Hellas property line was installed by unit owners, not insured contractors.

67.    Ms. Parsons believed that the August 8 letter was effectively another denial of her fence request and an excuse for the Board to continue to deny her requested accommodations.

**After the Board "Tentative[ly]" Approved the Fence Request as a Reasonable Accommodation with Onerous Conditions, Ms. Parsons's Mother Erects a Turkey Wire Fence Outside the Unit**

68.    After Ms. Parsons received Defendant Greeno's August 8 letter, Ms. Parsons's mother set up a small, unobtrusive turkey-wire fence immediately adjacent to the Unit's back porch, based on Ms. Parsons's understanding that the accommodation had generally been approved and that compliance with the onerous aesthetic conditions would be difficult to satisfy and would further delay her ability to benefit from the accommodation she had requested over six months earlier.

69.    Within hours of the fence going up, Board member Matthew Pinkham took photographs of the fence and sent them to the Board. Defendant Greeno emailed the Board and specifically instructed Erin Mayo, the Board's Treasurer at the time, to send a warning to Ms. Parsons demanding that she remove the fence immediately because it was "unauthorized." Defendant Greeno admitted in his email to the Board that his August 8 letter may have led to a "miscommunication" with Ms. Parsons, but stated that the fence will "be removed in the end, even if we hire someone to do it and charge [Ms. Parsons] for it." Defendants made no effort to clarify the August 8 "miscommunication" with Ms. Parsons herself.

70.    On August 13, 2024, Defendant Greeno sent an email to another Hellas unit owner, Rob Lawlis. Greeno disclosed to Mr. Lawlis that Ms. Parsons had requested disability accommodations and that the Board "felt legally obligated" to approve them. Despite this

18

purported approval, Defendant Greeno told Mr. Lawlis that the Board intended to remove the fence and bring "legal action" against Ms. Parsons for erecting it. Greeno then instructed Mr. Lawlis to report "any issues with [Ms. Parsons's] dogs being a nuisance," and to "send those complaints to us with dates and times" so the Board could "keep a log of issues," a transparent invitation to generate complaints against Ms. Parsons's accommodation and to manufacture an excuse to revoke the accommodation.

**Ms. Parsons Files a Fair Housing Complaint with the Maine Human Rights Commission, Prompting the Board to Freeze Spending on Maintenance and Other Common Services to Hellas Residents**

71.     On August 16, 2024, Ms. Parsons filed a housing discrimination complaint with the Maine Human Rights Commission ("MHRC") against Hellas and three former Board members. Ms. Parsons later amended her complaint to add Defendants Greeno and Allran as respondents and to withdraw her complaint against the three other Board members.

72.     On August 29, 2024, the Board received notice of Ms. Parsons's MHRC complaint. Defendant Greeno emailed the Board that day to announce that, because of the complaint, all non-essential spending by the Board would stop immediately.

73.     MHRC's notice instructed Hellas and the individual respondents to respond to the allegations in Ms. Parsons's complaint and provide the MHRC with relevant information and documents. Defendant Greeno informed the Board that he did not plan to include the August 8 letter in their document production to MHRC because doing so would be "risky." He reasoned that the letter "states [the Board's] faults . . . that we originally denied the request, that we did not specify the need, and that we took too long to respond." Defendant Greeno then instructed Ms. Mayo to fine Ms. Parsons for failing to remove the fence.

74.     On September 3, 2024, the Board informed all homeowners that a Hellas resident had filed a discrimination complaint with the MHRC. The email stated, "During the course of the

19

investigation by the MHRC, all non-essential spending will stop so that we are financially prepared for a negative outcome if it should be found that we discriminated." The email continued: "Due to the timing of the investigation, this may mean that we do not get back to [non-essential projects] until after the winter months."

75. The discontinued non-essential services included pavement maintenance in the Hellas parking lot, which Ms. Parsons depended on to move safely around the Property, especially during winter.

76. On September 10, 2024, Ms. Parsons contacted the MHRC to add a retaliation claim to her complaint based on the Board's September 3 email.

**Ms. Parsons is Forced to Obtain Temporary Orders of Protection from Harassment Against Defendants Greeno and Allran**

77. Around the time that she filed her MHRC complaint, Ms. Parsons learned, through personal observation and conversations with neighbors, that Defendants Greeno and Allran had instructed neighbors not to socialize with her or her husband, to surveil Ms. Parsons and her husband, and to report their actions to the Board.

78. Ms. Parsons witnessed Defendants Greeno and Allran following and observing her while she was on the property and taking notes on her activities. Neighbors and other Board members also informed Ms. Parsons that Defendant Allran wanted to remove the doorbell camera that Ms. Parsons and her husband had legally installed above their front door for security; that Defendants Greeno and Allran had complained openly to Hellas residents about her requests for accommodations; and that Defendants Greeno and Allran had told other Hellas residents that Ms. Parsons had ruined the aesthetics of the community by installing stair treads and hand railings on her exterior staircases, both of which were necessary for her balance and stability because of her disabilities.

20

79.  On September 2, 2024, just days after the Defendants received notice of Ms. Parsons's MHRC complaint, Ms. Parsons received three invoices from the Board. The first was a $25.00 fine for her "unauthorized" fence; the second was a $25.00 fine for failing to submit a DNA swab from Otis to PooPrints; and the third was a $0.00 "warning" for purportedly failing to provide "prescriptive letters" in support of her requests for reasonable accommodations.

80.  Given the timing, Ms. Parsons understood that the invoices were sent in retaliation for her complaint to the MHRC. At the same time, she was growing increasingly uncomfortable with Defendant Greeno's constant, unwanted email communications to her. She was disturbed by neighbors' reports that Defendants Greeno and Allran were openly complaining about her disabilities, instructing other unit owners to monitor her and her husband and submit reports to the Board on their activities, and encouraging neighbors to cease all contact with her and her husband.

81.  On the afternoon of September 2, 2024, Ms. Parsons contacted the Old Town Police Department. She explained to an officer that she believed she was being harassed by Defendant Greeno and wanted to understand her rights. The officer said that he would speak to Defendant Greeno and tell him to stop contacting Ms. Parsons.

82.  The officer then called Defendant Greeno, who denied that he had been harassing Ms. Parsons. According to the police report, Defendant Greeno then told the officer that he planned to contact the Old Town Police Department in the coming weeks to "go stand by while he hires a company to take the fence down and [] remove one of the dogs." When the officer cautioned Defendant Greeno that these actions might be illegal, Defendant Greeno informed the officer that "he could in fact do this as it is a part of the HOA."

83.  Ms. Parsons learned of Defendant Greeno's disturbing threats from the police report.

84.     Based on Defendant Greeno's repeated harassment of and threats against her; his requests to Hellas residents to surveil her and report on her movements to the Board; and Ms. Parsons's personal knowledge of allegations of recent violence and abuse by Greeno, Ms. Parsons feared for her personal safety and of potential harm to her property. She quickly sought and was granted a temporary order of protection from harassment against Defendant Greeno from the Bangor District Court on November 4, 2024.

85.     On the same day, Ms. Parsons sought and was granted a temporary order of protection from harassment against Defendant Allran, based on her alleged surveillance and monitoring of Ms. Parsons, as well as her stated desire to remove the Parsons' doorbell security camera without their consent.

86.     Both temporary orders of protection prohibited Defendants Greeno and Allran from having any contact with Ms. Parsons; imposing any restriction on Ms. Parsons's person or liberty; threatening, assaulting, harassing, or otherwise disturbing the peace of Ms. Parsons; following Ms. Parsons; entering Ms. Parsons's residence; and taking or damaging Ms. Parsons's property.

**Defendants Greeno and Allran Did Not Vote to Approve Ms. Parsons's Existing Fence, Even with Additional Medical Documentation**

87.     On October 8, 2024, Ms. Parsons participated in a conference with the MHRC investigator, Hellas, and the three originally named individual respondents. All respondents were represented at the conference by the Association's attorney, Jay Gregory.

88.     After the conference, Mr. Gregory told Ms. Parsons that the Board would be "willing to provide an unconditional accommodation" to her after she provided the requested medical documentation in support of her requested accommodations.

89.     Based on the Board's representations, and in a good-faith effort to secure a resolution of her accommodation requests, Ms. Parsons sent the Board two letters from her medical

providers on October 18, 2024, detailing her need for her service dog and a fenced-in area outside her Unit. Despite her discomfort, she also gave permission to Mr. Gregory to contact her physician directly to verify the letters in an effort to finally obtain these accommodations without further delay or harassment.

90.     On October 19, 2024, the Board acknowledged to Ms. Parsons that Otis was a service animal, not a pet, and purported to "grant" Ms. Parsons's fence request. However, this "approval" was still conditioned on several aesthetic demands that were unnecessary and unrelated to Ms. Parsons's use of the accommodation, including both the aesthetic demands communicated in the August 8 letter and new, additional demands that would be difficult if not impossible for Ms. Parsons to satisfy. Specifically, the letter stated the Ms. Parsons was required to "have an approved building permit on file with the City of Old Town," despite the fact that Old Town does not require or issue permits for residential fences, like the turkey-wire fence erected behind Ms. Parsons's Unit, that are under six feet high. Defendant Greeno also newly demanded, without explanation or justification, that Ms. Parsons add an unnecessary gate to her existing fenced-in enclosure.

91.     As MHRC later found, these onerous demands amounted to a constructive denial of Ms. Parsons's accommodation request.

92.     On or around October 30, 2024, the Board convened to vote on whether Ms. Parsons existing turkey-wire fence should be approved as-is without compliance with the multiple aesthetic demands enumerated by Defendant Greeno in the Board's August 8 and October 19 letters. Despite the Board's prior promises to grant an "unconditional accommodation" to Ms. Parsons upon receipt of her medical documentation, Defendant Greeno abstained from voting and Defendant Allran voted against approving the fence as-is. On October 30, 2024, the existing fence

was approved by a 2-to-1 vote when the two remaining Board members voted in favor of it. In a subsequent email to the Board, Greeno admitted that "[i]t did not go the way I would have voted."

93.     Immediately after the Board voted to approve Ms. Parsons's existing turkey wire fence, Defendant Greeno sent a follow-up email to the Board proposing even more demands for Ms. Parsons to meet as a condition of the accommodation, including that she be prohibited from placing personal items in the enclosure and that the Board "will monitor common property within the enclosed area."

94.     Ms. Parsons understood that Defendants would continue to harass her and impose unnecessary, invasive, and burdensome conditions on her ability to keep her fenced-in area, in retaliation for asserting her fair housing rights. In turn, she no longer felt safe or comfortable continuing to live at Hellas given the open and ongoing hostility from Defendants. Ms. Parsons and her husband had no choice but to vacate the Unit and purchase a new home in Milford, Maine in December 2024, where they currently reside. Ms. Parsons still owns the Unit.

**Even After Ms. Parsons Vacated Her Unit, Defendant Greeno Has Continued to Threaten, Intimidate, and Retaliate Against Her**

95.     On December 20, 2024, the MHRC issued a report finding reasonable grounds existed to believe that Defendants had discriminated against Ms. Parsons because of her disabilities and retaliated against her for engaging in protected activity in violation of the MHRA's fair housing provisions.

96.     On December 22, 2024, Board members exchanged emails acknowledging that "things are certainly escalating," referring to Ms. Parsons' legal claims against Defendants. Given the MHRC's finding in favor of Ms. Parsons, Board member Greta Lowe suggested that the Board drop the numerous fines it had levied against Ms. Parsons for alleged violations of Association rules, including failure to pay for a DNA test for her service animal, which the MHRC had found

24

was evidence of discrimination and retaliation. Another Board member, Matthew Pinkham agreed. However, Defendant Greeno responded, "Having broken the rules, the fines should stay." The fines were not removed from Ms. Parsons's account at that time.

97.     Under Maine law, it is unlawful to condition the use of a service animal on the payment of a fee—something that Defendant Greeno himself acknowledged in the Board's August 8 letter. Nevertheless, Defendant Greeno insisted that the Board continue to impose these improper fines even after the MHRC found in favor of Ms. Parsons.

98.     On March 10, 2025, MHRC held a hearing and adopted the investigator's recommended finding that there was cause to believe that Defendants had discriminated and retaliated against Ms. Parsons. MHRC memorialized this determination in a Statement of Findings, released March 12, 2025, and ordered the parties to engage in conciliation, which ultimately failed.

99.     On March 11, 2025, after receiving notice that the MHRC had adopted the investigator's findings and conclusions, Ms. Parsons sent an email to Board member Rob Lawlis, whose stated reason for joining the Board was to ensure that it made responsible fiscal decisions. Ms. Parsons sent the email to the general Board email address, to which all Board Directors have access, and to Mr. Lawlis's personal email address. Her message began: "For Rob, and Rob only." Ms. Parsons conveyed to Mr. Lawlis that she was concerned by his continued participation on the Board after the MHRC's determination that it had discriminated and retaliated against her.

100.    Defendant Greeno, having access to the general Board email account, viewed Ms. Parsons's message to Mr. Lawlis. After seeing the email, Defendant Greeno immediately called the Old Town Police Department to report that Ms. Parsons had contacted him, even though the message was neither sent nor addressed to Defendant Greeno, and Ms. Parsons was within her

rights to both contact the Board and Greeno himself. An officer then called Ms. Parsons, who informed the officer that she believed Defendant Greeno had made a false police report.

101.   Ms. Parsons understood Defendant Greeno's report to the Old Town Police Department to be retaliation intended to harass and intimidate her after she prevailed on her MHRC claims.

102.   In June 2025, frustrated by the discriminatory and traumatic events in 2024, Ms. Parsons left a Google review on Defendant Greeno's wedding photography business page. The review reads: "Sends emails opposing the Americans with Disabilities Act (ADA) from business email address." This review was based on Defendant Greeno's communications with Board members from his personal and business account, in which he stated, "As a homeowner I would not want a private fence going up," and "[w]hile the board may have obligations under the ADA, obligations to uphold the rules and regs that affect all homeowners remain."

103.   On February 20, 2026, Ms. Parsons, through a letter from her counsel to Defendants' attorney, Mr. Gregory, extended a confidential settlement demand to Defendants in a good faith attempt to settle the dispute without litigation.

104.   On or around March 4, 2026, before Defendants responded to the February 20 letter, Defendant Greeno posted a public reply to Ms. Parsons's then eight-month-old Google review. His reply improperly disclosed confidential settlement information contained in the February 20 letter, and stated: "I have contacted the police multiple times, and will continue to do so or sue, if you continue to leave repeated negative reviews on my business." Ms. Parsons has only ever made one post on the Google review page for Defendant Greeno's business.

105.    On March 5, 2026, Ms. Parsons's counsel contacted Mr. Gregory to notify him that Defendant Greeno's public Google reply constituted unlawful retaliation against Ms. Parsons and to demand that Defendant Greeno immediately remove the posting.

106.    Mr. Gregory did not respond to this request. As of the date of this Complaint, Defendant Greeno's retaliatory post is still publicly available on his business's Google review site.

## INJURIES TO PLAINTIFF

107.    As a result of Defendants' discriminatory and retaliatory conduct described above, Ms. Parsons has suffered irreparable loss and injury, including but not limited to economic loss, emotional distress, loss of housing opportunities, and the deprivation of her housing and civil rights.

108.    Defendants placed Ms. Parsons in reasonable fear for her safety and caused her to suffer extreme anxiety and distress that required her to obtain orders of protection from a court, seek assistance from multiple mental health professionals, and take prescription medications. The fear and stress Ms. Parsons suffered because of Defendants' actions severely exacerbated her PTSD symptoms and caused her to experience frequent nausea, sleeplessness, and suppressed appetite.

109.    Because of Defendants' actions, Ms. Parsons had to miss school on multiple occasions and was eventually forced to request and obtain accommodations from her school's Title IX office permitting her to turn in assignments late.

110.    Defendant Greeno's threat to forcibly remove Ms. Parsons's service animal from her home—and to involve law enforcement in this endeavor—left Ms. Parsons terrified for her safety, her husband's safety, and for the safety of Otis, her service animal. Defendants' open hostility toward Ms. Parsons and their refusal to timely consider or grant her necessary

accommodations was both dangerous to Ms. Parsons's health and physical safety, and deeply degrading and humiliating to her as a person with disabilities.

111. Because of Defendants' unlawful actions, Ms. Parsons and her husband were forced to find alternative housing and began moving out of the Unit in or around December 2024, which required her to incur moving expenses, higher housing costs, and suffer other economic losses.

## CAUSES OF ACTION

### COUNT I

**Fair Housing Act, 42 U.S.C. §§ 3604(c), (f)(2)**
**Discrimination on the Basis of Disability**

112. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

113. Defendants discriminated against Ms. Parsons in the terms, conditions, and privileges of housing, or in the provision of services or facilities in connection therewith, because of her disabilities, in violation of 42 U.S.C. § 3604(f)(2), in that:

    a. Defendants' actions and omissions constitute a refusal to make "reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy their dwelling," 42 U.S.C. § 3604(f)(3)(B); and

    b. Defendants created a hostile housing environment by subjecting Ms. Parsons to disability-based harassment that subjected her to discrimination in the terms, conditions, or privileges of her housing.

114. Defendants' statements to Ms. Parsons and others indicated a discriminatory preference or limitation in the provision of housing on the basis of disability, in violation of 42 U.S.C. § 3604(c).

115. Plaintiff has been injured by Defendants' conduct and has suffered damages as a result.

116. Defendants' conduct was intentional, willful, and carried out with reckless disregard of Ms. Parsons's known rights under the law.

**COUNT II**

**Fair Housing Act, 42 U.S.C. § 3617**
**Retaliation**

117. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

118. Under 42 U.S.C. § 3617, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by substantive protections of the Fair Housing Act.

119. Defendants retaliated against Ms. Parsons for asserting her rights and pursuing legal action under the Fair Housing Act, in violation of 42 U.S.C. § 3617, when they:

    a. Violated Ms. Parsons's privacy by disclosing her requests for disability-related accommodations in public Board meeting minutes and in private communications with Hellas residents;

    b. Directed Hellas residents to cease speaking with Ms. Parsons and her husband;

    c. Directed Hellas residents to monitor and surveil Ms. Parsons and her husband, and to report their actions to the Board;

    d. Made explicit threats against Ms. Parsons's property, including her service animal, within days of learning that she had filed an MHRC complaint, placing her in legitimate fear for her safety and forcing her to obtain orders of protection;

29

e. Disclosed confidential settlement communications in public, online postings;

f. Publicly threatened to report Ms. Parsons to law enforcement and bring baseless civil actions against her for lawful public statements about Defendant Greeno's statements on Ms. Parsons's disabilities and requested accommodations; and

g. Suspending spending on common services, including pavement maintenance, in response to Ms. Parsons's MHRC complaint, and notifying Hellas residents that services would be suspended because of Ms. Parsons's MHRC complaint.

120. Defendants created a hostile housing environment by subjecting Ms. Parsons to retaliatory harassment in violation of 42 U.S.C. § 3617.

121. Plaintiff has been injured by Defendants' conduct and has suffered damages as a result.

122. Defendants' conduct was intentional, willful, and carried out with reckless disregard of Ms. Parsons's known rights under the law.

## COUNT III

**Maine Human Rights Act, 5 M.R.S. §§ 4582-A(2)–(3)**
**Discrimination Because of Disability**

123. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

124. Defendants refused to make a reasonable accommodation to their rules, policies, practices, or services, when doing so was necessary to afford Ms. Parsons equal opportunity to use and enjoy her home, in violation of 5 M.R.S. § 4582-A(2).

125. Defendants—having failed to show that Ms. Parsons's service animal posed a threat of any kind to any property or person—acted in violation of 5 M.R.S. § 4582-A(3), when they:

30

a. Refused to permit the use of Ms. Parsons's service animal or otherwise discriminated against Ms. Parsons for using a service animal as an accommodation for her disabilities; and

b. Levied fines against Ms. Parsons when she refused to pay for a DNA registration service for her service animal, which constitutes an unlawful fee under 5 M.R.S. § 4582-A(3).

126. Defendants created a hostile housing environment by subjecting Ms. Parsons to disability-based harassment that was sufficiently severe or pervasive to interfere with the terms, conditions, or privileges of her housing, in violation of 5 M.R.S. §§ 4582-A(2)–(3).

127. Ms. Parsons has been injured by Defendants' conduct and continues to suffer damages as a result.

128. Defendants' conduct was intentional, willful, and carried out with reckless disregard of Ms. Parsons's known rights under the law.

## COUNT IV

### Maine Human Rights Act, 5 M.R.S. §§ 4633(1)–(2)
### Retaliation

129. Plaintiff repeats and incorporates by reference all of the allegations set forth above.

130. Defendants retaliated against Ms. Parsons for opposing unlawful acts and practices and filing a charge of housing discrimination with the Maine Human Rights Commission, in violation of 5 M.R.S. § 4633(1).

131. Defendants coerced, threatened, intimidated, or interfered with Ms. Parsons's exercise and enjoyment of her rights under the MHRA, because she had engaged in MHRA-protected activity, in violation of 5 M.R.S. § 4633(2).

132.    Defendants created a hostile housing environment by subjecting Plaintiff to retaliatory harassment in violation of 5 M.R.S. §§ 4633(1)–(2).

133.    Plaintiff has been injured by Defendants' conduct and has suffered damages as a result.

134.    Defendants' conduct was intentional, willful, and carried out with reckless disregard of Ms. Parsons's known rights under the law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Rebecca Parsons respectfully request that the Court:

1.    Enter a declaratory judgment that Defendants' actions, statements, and policies complained of in this Complaint violate the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, and the Maine Human Rights Act, 5 M.R.S. §§ 4582-A, 4633;

2.    Enter a permanent injunction:

    a.    Enjoining and restraining Defendants from denying or limiting reasonable accommodations to current and prospective tenants based on disability status, retaliating against individuals for asserting their rights under the FHA and MHRA, and from making any statements which indicate any preference, limitation, or discrimination based on disability, or an intention to make any such preference, limitation, or discrimination; and

    b.    Directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct against Ms. Parsons and to prevent future instances of such conduct or similar conduct.

3.    Award compensatory damages to Plaintiff in an amount to be determined by a jury to fully compensate her for the injuries caused by Defendants' conduct;

4.      Award punitive damages to Ms. Parsons in an amount to be determined by a jury that would punish Defendants for the willful, malicious, and reckless conduct alleged in this Complaint and that would effectively deter similar conduct in the future;

5.      Award Plaintiff her reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2) and 5 M.R.S. § 4683;

6.      Award pre-judgment interest to Plaintiff; and

7.      Order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Under Fed. R. Civ. P. 38(b), Plaintiff requests a trial by jury on all issues triable as of right.

DATED: May 14, 2026                                 Respectfully submitted,

                                                    /s/ Jeffrey Neil Young
                                                    Jeffrey Neil Young
                                                    Zoe Tucker
                                                    SOLIDARITY LAW, PLLC
                                                    9 Longmeadow Road
                                                    Cumberland Foreside, ME 04110
                                                    (207) 844-4243
                                                    jyoung@solidarity.law
                                                    ztucker@solidarity.law

                                                    Joseph J. Wardenski*
                                                    Mack Karbon*
                                                    WARDENSKI P.C.
                                                    134 West 29th Street, Suite 709
                                                    New York, NY 10001
                                                    (347) 227-2500
                                                    joe@wardenskilaw.com
                                                    mack@wardenskilaw.com

                                                    *Attorneys for Plaintiff Rebecca Parsons*

                                                        * Application for pro hac vice admission
                                                          forthcoming